**LOUIS LOEVSKY** and **MOLLY LOEVSKY**, Plaintiffs–Appellants, v. **LAURIE CARTER, MICHAEL CLARK**, and **COUNTY OF HAWAII**, Defendants–Appellees, and **COUNTY OF HAWAII**, a municipal corporation, Third–Party Plaintiff–Appellee, v. **RICHARD A. WILLIAMS, III**, Third–Party Defendant

NO. 13187

(CIV. NO. 85–384)

MAY 4, 1989

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY HAYASHI, J.

This is an appeal from the Second Amended Judgment entered in the Third Circuit Court on July 20, 1988. Following a jury trial, judgment was entered: 1) in favor of Plaintiff–Appellant Louis Loevsky and against Defendants–Appellees Michael Clark (Michael) and Laurie Carter (Laurie), jointly and severally, for negligence; 2) in favor of Plaintiff–Appellant Molly Loevsky and against Michael and Laurie, jointly and severally, for loss of consortium; and 3) in favor of Defendant and Third–Party Plaintiff–Appellee County of Hawaii (County).

Plaintiffs–Appellants Louis Loevsky (individually Plaintiff) and Molly Loevsky (collectively Plaintiffs) contest the portion of the judgment rendered in favor of County, absolving County of liability.

We vacate the Second Amended Judgment and remand the case for a new trial.

I.

## FACTUAL BACKGROUND

This civil action arises out of a motorcycle and pedestrian accident on December 23, 1984, at approximately 10:52 a.m., along Ainaola Drive, near the junction of Waikahe Road at Hilo, Hawaii. A motorcycle owned by Michael and driven by Laurie with Michael as a passenger slid as they were attempting to round a "broken back" curve on Ainaola Drive,[1] hit the guardrail and struck Plaintiff as he was jogging along the east shoulder of Ainaola Drive towards the oncoming northbound traffic, causing Plaintiff extensive injuries.

Laurie testified that on the date of the accident, December 23, 1984, she was nineteen years old, held a driver's license and an expired motorcycle permit,[2] had driven a motorcycle since she was thirteen years old, and prior to the accident it was about a year since she had last operated a motorcycle.

Laurie further testified that on the morning of the accident, she woke up around 10:00 a.m., drank two or three cups of coffee, didn't eat anything, brushed her teeth, took a shower, changed her clothes, and then she and Michael (who had slept over)[3] decided to go on a motorcycle ride because it was a nice day.[4]

---

[1] The subject curve is made up of two separate curves separated by a short straight section. The posted speed limit along the pertinent stretch of Ainaola Drive is 35 m.p.h.

[2] According to Laurie's testimony, the motorcycle permit restricted her from driving at night and from driving with a passenger.

[3] Michael testified that Laurie was a close friend and not his girlfriend.

[4] Our review of the transcripts reveals that Laurie was not asked what time they left her home to go on the motorcycle ride.

Laurie rode on the back of Michael's motorcycle for five to ten minutes until they stopped at the hilltop on Ainaola Drive, Michael asked Laurie if she wanted to drive, Laurie responded "yeah," Laurie then proceeded to drive down Ainaola Drive, as they approached the particular turn, Michael told Laurie to watch the turn, Laurie was travelling approximately 30–35 m.p.h. before she gently applied the hand brake as they approached the turn (and in response to Michael's earlier warning), Laurie made a gentle turn, felt the bike slide, then blanked out, and could neither remember anything more about the accident nor the location where the motorcycle went down. And before the motorcycle went down, Laurie didn't see any gravel on the roadway and wasn't looking for any gravel on the roadway.

The only other witness to the accident, Michael, testified that at the hilltop they stopped, traded places, Laurie operated the motorcycle for about 1 to 1–1/2 minutes up until the time of the accident, Michael told Laurie to take the particular curve slow as a precautionary warning, Laurie was travelling about 30 m.p.h. when she took the turn a little wide, entered the curve in the center of the lane, started drifting, Michael saw gravel, they hit the gravel with the front wheel, the motorcycle just slid out and slid straight towards the guardrail, the front end of the motorcycle then struck the guardrail, spun back out, struck Plaintiff, and Laurie was then thrown off the bike, followed by Michael.

At trial, excessive speed, Laurie's unfamiliarity with the motorcycle, her loss of control and balance, and her failure to properly react, were some of the evidentiary factors attributing fault to Laurie and Michael. Also, independent testimonial evidence suggested that Laurie had consumed two beers prior to the accident.[5] And contradictory evidence was

---

On direct examination, Michael testified as follows:

Q At the time you left the residence, what's your best estimate of the time you left the residence to go on this motorcycle ride?

A Again, I could only approximate, but I imagine around 10:00 o'clock, 10:30.

Transcript of April 15, 1987 at 3–4.

[5] Patti Sherrard (Sherrard), an assistant manager at a local restaurant where Laurie was employed as a waitress, testified that during her visit with Laurie at the hospital emergency room following the accident, she hugged Laurie and noticed a smell of alcohol on her breath. Thereupon, with tears in her eyes, Laurie

adduced as to whether the presence of gravel, if any, on the public roadway, was a contributing factor to the accident.

This civil action commenced with the filing of Plaintiffs' complaint on June 10, 1985 (and later amended on July 30, 1985). Count I alleged the negligent operation and entrustment/supervision of the motorcycle against Defendants Laurie and Michael, respectively. Count II alleged the negligent design, repair and maintenance of the public roadway against Defendant County.

On March 24, 1987, Laurie filed a motion in limine, seeking to exclude, *inter alia*: 1) evidence of Laurie's alleged consumption of alcohol prior to the accident, on the basis of undue prejudice; and 2) demonstrative evidence in the form of a videotape prepared by an accident reconstructionist retained by County, on the basis that many of the material facts surrounding the actual accident were factually dissimilar from the facts upon which the videotape was based, and hence, was untrustworthy and unduly prejudicial.

A hearing on Laurie's motion in limine was held on April 7, 1987 before the Third Circuit Court, and the circuit court's written Order Partially Granting Defendant [Laurie] Carter's Motion in Limine was subsequently entered on April 14, 1987. In its written order, the circuit court ruled admissible: 1) testimony concerning Laurie's use of beer prior to the accident, including Patti Sherrard's deposition testimony about "Patti, we were wasted," provided that any testimony based on guesses, assumptions, beliefs, and thoughts were prohibited; and 2) the videotape.[6]

---

stated to Sherrard, "Patti, we were wasted." Transcript of April 30, 1987 at 201. Laurie then explained to Sherrard how the accident happened.

Sherrard further testified that she spoke to Michael immediately thereafter at the hospital waiting room. Michael's explanation of the accident to Sherrard included the statement that Laurie had previously had enough to drink to hinder her driving ability.

One of the paramedics at the accident scene, Clesson Murasaki, testified that in response to his inquiry on whether she had consumed any alcohol, Laurie replied that she had a couple of beers.

At trial, Laurie and Michael both denied that Laurie had consumed any alcoholic beverages prior to the accident.

[6] The certified, filed transcript of the April 7, 1987 pre-trial hearing is not included in the appellate record. We are unable to determine, therefore, whether the circuit judge viewed the videotape prior to rendering it admissible or whether the

Jury trial commenced on April 14, 1987.

During County's case–in–chief, John Stephenson (Stephenson), qualified as an expert in the handling and safe operation of motorcycles and in the reconstruction of motorcycle accidents, testified that the actual motorcycle involved in the accident (in its repaired condition) was driven by Stephenson in various test runs at the accident scene and was recorded on videotape.

In a particular series of runs, three bags of fairly coarse dirt and gravel were laid down on the edge of the roadway at the curve, and Stephenson drove around the curve, through the rock and gravel area, up to speeds of approximately 34 m.p.h. Also, Stephenson was not carrying a passenger during most of the runs through the dirt and gravel area, and while Stephenson drove through this area essentially along the shoulder stripe, Laurie had entered the curve just left of the center of the lane. Laurie's angle of approach, Stephenson acknowledged, was therefore different from Stephenson's.

Dr. Bernice Coleman (Dr. Coleman), qualified as an expert on the effects of alcohol on the human body and behavior, was asked to assume as true the following facts: 1) a nineteen year old female weighing approximately 130 pounds; 2) awoke at around 10:00 a.m.; 3) had several cups of coffee; 4) drank two beers; and 5) was later identified at approximately 10:52 a.m. as the driver involved in a motorcycle and pedestrian accident.

Based on these assumptions and the additional assumptions that the hypothetical female consumed both beers at periods somewhere between 10:00 – 10:30 a.m., Dr. Coleman testified, over Plaintiffs' objection, on the range of blood alcohol content the female would have been experiencing at approximately 10:45 – 10:50 a.m. Dr. Coleman then testified as to the effects of such a level of blood alcohol absorption on the human body and behavior.

---

first time he viewed the videotape was with the jury during County's case–in–chief.

Where the admissibility of the contents of a visual recording is at issue in a judicial proceeding, we direct that Hawaii trial courts in the future undertake their best efforts in attempting to view the subject visual recording prior to ruling on its admissibility. *Cf. Brandt v. French*, 638 F.2d 209 (10th Cir. 1981) (the trial judge should review the film in question outside of the jury's presence before deciding whether to admit the film into evidence).

Dr. Thomas Bolster (Dr. Bolster), qualified as an expert in the area of accident reconstruction, testified that one of the purposes of the videotape was to demonstrate the principle that one can negotiate this roadway and curvature at speeds of approximately 30 m.p.h. even if there is a rather over abundance of gravel.

Over Plaintiffs' and Defendants Laurie's and Michael's previously raised objections, County subsequently admitted into evidence through Dr. Bolster (the operator of the video camera) the videotape generated on October 25, 1986. The videotape was then played before the jury with Dr. Bolster simultaneously under direct examination. Later, Dr. Bolster was cross–examined by the respective parties on the purpose and contents of the videotape.[7]

During the settling of jury instructions, Plaintiffs and Defendants Laurie and Michael objected to County's proposed instruction 15, which was thereafter given over their noted objections:

> The statute of the State of Hawaii provides that: No person shall operate or assume physical control of the operation of a motor vehicle while under the influence of intoxicating liquor.[8]

On May 5, 1987, the jury rendered a special verdict absolving the County of liability and finding Laurie (70%) and Michael (30%) liable. Following the entry of the Second Amended Judgment on July 20, 1988, this timely appeal followed.

---

[7] The videotape was replayed before the jury during Plaintiffs' cross–examination of Dr. Bolster.

[8] County's proposed instruction 15 was given, as modified by the circuit court, over the parties' objections. The instruction, as originally proffered, read:

> Whether or not a driver operates a vehicle while under the influence of intoxicating liquor is an important circumstance bearing on the issue of the driver's negligence.
>
> No person shall operate or assume physical control of the operation of a motor vehicle while under the influence of intoxicating liquor.

County's jury instruction form cited *Kaeo v. Davis*, 68 Haw. 447, 719 P.2d 387 (1986) (citing *Soriano v. Medina*, 648 S.W.2d 426 (Tex. Civ. App. — San Antonio 1983)), and HRS § 291–4(a)(1), as sources for the originally proffered instruction, *supra*.

## II.

## THE ADMISSION AND SUBSEQUENT USE OF EVIDENCE

While Plaintiffs raise various issues on appeal, we focus our attention to two areas of underlying concern: 1) the introduction of the videotape into evidence; and 2) the evidence of Laurie's alleged consumption of alcohol prior to the accident.

### A.

### THE VIDEOTAPE

The tape's visual contents include four crucial test runs described as follows:

1)    the solo rider travelling around the curve, near the shoulder of the lane, over the pre–placed gravel, at 32–34 m.p.h.;

2)    the solo rider travelling the same route, over the pre–placed gravel, at a diminished speed of 30–31 m.p.h.;

3)    the solo rider travelling the same route, over the pre–placed gravel, at a diminished speed of 29–30 m.p.h.; and

4)    the fourth run, shot from the video camera being held by Dr. Bolster while seated as a passenger behind the test rider Stephenson, recording the motorcycle's path while travelling the same route, close to, *but not* over the pre–placed gravel, at Dr. Bolster's estimated speed of approximately 30 m.p.h.

Plaintiffs contend the tape was made under circumstances so dissimilar to the actual accident that the circuit court abused its discretion in admitting the tape into evidence.

"[W]hen a test or experiment is an attempt to reenact the original happening, the essential elements of the experiment must be substantially similar to those existing at the time of the accident." *Carr v. Suzuki Motor Co.*, 280 Ark. 1, 3, 655 S.W.2d 364, 365 (1983). And "[a]lthough the decision whether to admit evidence of experiments rests largely in the

sound discretion of the trial judge, it is well settled that reconstruction experiments are incompetent unless the essential elements of the experiment are shown to be substantially similar to those existing at the time of the accident." *Hubbard v. McDonough Power Equip., Inc.*, 83 Ill. App. 3d 272, 280, 404 N.E.2d 311, 318 (1980) (citations omitted).

In *Carr*, the Arkansas Supreme Court held that the trial court erred in admitting into evidence a videotape showing a professional driver riding a motorcycle with two functioning shock absorbers and then with only one functioning shock absorber. The court reasoned that the test did not duplicate the exact conditions of the actual accident, and hence, the videotape was remotely relevant, prejudicial and misleading.

Similar to *Carr*, here it is undisputed that the motorcycle test neither duplicated the exact conditions nor substantially resembled the actual accident. Indeed, numerous factual differences are apparent.[9] Accordingly, the tape was not admissible for reenactment purposes.

County does not dispute the existence of factual dissimilarities in the tape. Rather, County contends the circuit court did not abuse its discretion in admitting the tape into evidence where the purpose of the tape was for the demonstration of a principle, and not for reenactment purposes. Specifically, the principle demonstrated was that one can negotiate the road-

---

[9] For example:

1) the amount of gravel placed on the roadway by County, as County acknowledged during oral argument, was largely a "subjective determination," since County's position was that gravel was not present at the location where the motorcycle slid down on the accident date;

2) traffic was held up in both directions along Ainaola Drive by County employees while Dr. Bolster directed the test runs;

3) the test rider had prior notice of the pre–placed gravel on the roadway;

4) the test rider travelled solo during the first three crucial runs through the pre–placed gravel; and

5) the test rider, as he acknowledged in his trial testimony, drove past the curve at a different, more circular angle.

Moreover, we note that while the accident date was December 23, 1984, the videotape was not made until nearly two years later, on October 25, 1986. The forces of nature during this twenty–two month period, we presume, altered to an unknown extent the conditions surrounding the curve.

way and curvature even in the presence of gravel in a safe manner.[10] And since the tape's purpose was to demonstrate this principle, the requirement of substantial similarity of conditions was not required.

"Films or videotapes of experiments by an accident reconstructionist, physicist, engineer, or other witness qualified as an expert on the cause of accidents, *offered merely to illustrate the principles used in forming an opinion*, do not require strict adherence to the facts and are admissible in evidence, provided such films or tapes are not misleading in and of themselves and provided it is made clear that they are offered only as illustrations of the principles involved." 3 C. Scott, *Photographic Evidence* § 1317 (2d ed. Supp. 1987) (emphasis added) (footnote and citations therein omitted). "However, . . . it is essential that the jury be carefully instructed as to the extent to which they can use and consider the films or videotapes." *Id.* (footnote and citation therein omitted).

In our view, the tape's visual contents constitute a veiled attempt to successfully re–create the motorcycle ride under controlled conditions favorable to County. *See* note 9, *supra.* The prejudicial and misleading impact of the tape's contents on the jury, we believe, far outweighed its probative value, if any. *See* Hawaii Rules of Evidence (HRE) Rule 403. "The conclusion is inescapable that, after viewing the [tape], the mind–set of the jury was that[,]" *Carr*, 280 Ark. 1, 4, 655 S.W.2d 364, 366, since the motorcycle did not slide down during the crucial test runs, one could safely travel around the curve and through the rock and gravel area.

Given this lasting visual impression upon the jury, a logical inference could be made that the presence of gravel, if any, on the roadway during the actual accident, *should* not have been a contributing factor to

---

[10] According to County, the principle as demonstrated in the tape was created to rebut a portion of Michael's deposition testimony to the effect that gravel on a roadway is always going to result in a motorcycle falling down.

Upon questioning by Plaintiffs' counsel, the pertinent portion of Michael's deposition transcript reads as follows (emphasis added):

Q What was the first notice to you that there was a problem, whether it was with the bike, with the driver, the road, weather or whatever?

A I first realized when we were going down, when I saw how wide she was going in the turn and I saw she was going into the gravel. *When I saw the gravel, I knew we were going down. No matter how good you are, if you hit gravel, you are going down.*

Deposition of Michael Eugene Clark, August 29, 1985 at 25.

the motorcycle sliding down and subsequently causing Plaintiff's injuries. This flawed reasoning, however, was premised in large part on the distinct factual dissimilarities between the actual accident on December 23, 1984 and the October 25, 1986 reenactment. *See* note 9, *supra.*

These noted factual dissimilarities, in turn, rendered the tape's relevancy in establishing County's asserted principle suspect at best. *See* HRE Rules 401 and 402. Moreover, we find it obvious that County could have employed less burdensome alternatives, such as adequate cross–examination at Michael's deposition or at trial, in attempting to rebut Michael's deposition statement, *see* note 10, *supra*, which in effect was nothing more than a lay witness's opinion. *See* HRE Rule 701. Also, we doubt whether Michael's statement would have assisted the jury in its "determination of a fact in issue." *Id.*

Based on the foregoing reasoning, we hold that the circuit court abused its discretion in admitting the tape into evidence and in permitting its contents to be shown to the jury.

## B.

## CONSUMPTION OF ALCOHOL

Plaintiffs initially contend the circuit court failed to properly balance the probative value of Laurie's alleged alcohol consumption against the unfair prejudicial effect of such evidence on the jury. Essentially, Plaintiffs assert that a proper HRE Rule 403 balancing should have resulted in the exclusion of the evidence of Laurie's alleged consumption of alcohol prior to the accident.[11] We disagree.

---

[11] Plaintiffs' theory in this respect is premised in part on the following distinction. While in *Kaeo v. Davis*, 68 Haw. 447, 719 P.2d 387 (1986), the evidence of the driver's intoxication was undisputed, in this case the pertinent evidence was in dispute. According to Plaintiffs, the absence of any reference of alcohol consumption in the police, ambulance or any other written reports, together with the lack of suspicion of intoxication on the part of the investigating officers and treating physicians, should have resulted in the exclusion of the evidence of Laurie's alleged alcohol consumption.

We find no merit in Plaintiffs' contention. The contradictory evidence on this disputed issue was a factual determination "for assessment by the trier of fact . . . ." *Id.* at 455, 719 P.2d at 392.

"Evidence of intoxication is generally admissible on the issue of negligence in a vehicle accident case[,]" *McKenna v. Volkswagenwerk Aktiengesellschaft*, 57 Haw. 460, 467, 558 P.2d 1018, 1023 (1977), where the evidence tends to show that the driver's intoxicated condition was "'sufficient to impair his capacity to perceive the dangers with the clarity, make the decisions with the prudence, and operate the vehicle with the skill and caution required by law.'" *Kaeo v. Davis*, 68 Haw. 447, 453, 719 P.2d 387, 391 (1986) (quoting *Simon v. Commonwealth*, 220 Va. 412, 419–20, 258 S.E.2d 567, 572–73 (1979)). *Cf. Johnson v. Robert's Hawaii Tour, Inc.*, 4 Haw. App. 175, 184 n.10, 664 P.2d 262, 268 n.10 (1983) (jury instruction that "[e]vidence of intoxication may be considered in combination with all other conduct, under the circumstances shown by the evidence, in arriving at your decision as to whether any party exercised or failed to exercise ordinary care[,]" is a correct statement of the law). This rule governs even in the absence of any evidence of intoxication in a strict penal sense. *Kaeo*, 68 Haw. 447, 719 P.2d 387. And although the evidence of drinking is highly prejudicial, the responsibility for maintaining the delicate balance between probative value and prejudicial effect lies largely within the trial judge's discretion. *Id.*

Here, the evidence of Laurie's alleged alcohol consumption prior to the accident, *see* note 5, *supra*, although prejudicial to Laurie's case,[12] nevertheless, when combined with the other evidence attributing fault to Laurie and Michael, was highly relevant to the issue of the causal relationship between Laurie's conduct and Plaintiff's injuries.

Based on the foregoing reasoning, we hold that the circuit court properly exercised its discretion in admitting the evidence of Laurie's alleged consumption of alcohol prior to the accident.

Plaintiffs next contend the circuit court failed to properly exercise control over the propounding of hypothetical questions to Dr. Coleman by allowing her to use assumptions with no factual basis. Plaintiffs' position in this regard is essentially: "Although there is evidence that Laurie had two beers on the morning in question, there is absolutely no evidence as to when she consumed those beers." Opening Brief at 32–33. Dr.

---

[12] The prejudice to Plaintiffs, if any, was far outweighed by its probative value in that the evidence of Laurie's intoxication actually aided Plaintiffs' prima facie case of Laurie's negligent operation of the motorcycle.

Coleman's assumptions as to when the hypothetical female consumed the two beers, therefore, were based on speculation. We agree.

"[O]pinions of expert witnesses must be based upon facts in evidence[.]" *Padilla v. Warren*, 44 Colo. App. 189, 190, 610 P.2d 1352, 1353 (1980); *see also* HRE Rule 703.

Our review of the trial transcripts reveals that Dr. Coleman's assumptions that the hypothetical female consumed both beers at points somewhere between 10:00 – 10:30 a.m. were based on: 1) her review of Laurie's deposition transcript, wherein Laurie testified that she woke up around 10:00 a.m. on the morning of the accident; and 2) her review of certain records which indicated that the accident was reported at approximately 10:52 a.m.

It is clear that Dr. Coleman's assumptions as to when the hypothetical female consumed the two beers were not based on facts in evidence. Both Laurie and Michael denied that Laurie had consumed any alcoholic beverages prior to the accident. Moreover, assuming that they left Laurie's home at 10:30 a.m. to go on the motorcycle ride, *see* note 4, *supra*, when Laurie allegedly consumed the first and second beers was still open to question.[13]

Since Dr. Coleman testified that the absorption rate of alcohol in the human body generally takes 15 minutes, when Laurie allegedly consumed both beers was relevant in determining whether her judgment, coordination and perception were adversely affected prior to the accident.

We find that Dr. Coleman's assumptions as to when the hypothetical female consumed both beers were based on mere speculation. *Cf. First Ins. Co. of Haw. v. International Harvester Co.*, 66 Haw. 185, 659 P.2d 64 (1983) (there was no abuse of discretion in the trial court rejecting some of the expert testimony offered by the City where a proper foundation for its introduction was lacking, where it was of questionable relevance, and where it was speculative, respectively). Dr. Coleman's subsequent testimony on the range of blood alcohol content the hypothetical female would have been experiencing at approximately 10:45 – 10:50 a.m., in turn, was inadmissible as untrustworthy. *See* HRE Rule 703.

---

[13] While we recognize that no beer bottles or cans were found at or near the accident scene, it is possible that one or both beers were consumed after they left Laurie's home.

Accordingly, we hold that the circuit court abused its discretion in allowing Dr. Coleman to testify on the range of the hypothetical female's blood alcohol content on the basis of speculative factual assumptions.

Plaintiffs further contend the circuit court erred by giving instruction 15 when it was not warranted by the evidence. We agree, based on additional reasoning.

The trial court does not err where it gives an instruction which is a correct statement of the law and which does not render the instructions as a whole prejudicially insufficient, erroneous, inconsistent or misleading. *Johnson*, 4 Haw. App. 175, 664 P.2d 262.

Instruction 15, as originally proffered by County, we believe, "entangles" in a misleading manner civil negligence with a driving under the influence of intoxicating liquor (DUI) penal standard. *Compare* note 8, *supra, with Kaeo*, 68 Haw. 447, 451, 719 P.2d 387, 390, *and* HRS § 291–4(a)(1) (1985). Moreover, the instruction as given, subsequent to its modification by the circuit court, in our view, is not an accurate statement of the statutory provision at issue herein.

HRS § 291–4(a)(1) provides:

> **Driving under influence of intoxicating liquor.** (a) A person commits the offense of driving under the influence of intoxicating liquor if:
> (1)     The person operates or assumes actual physical control of the operation of any vehicle while under the influence of intoxicating liquor[.]

Instruction 15, in contrast, reads (emphasis added):

> The statute of the State of Hawaii provides that: *No person shall* operate or assume physical control of the operation of a motor vehicle while under the influence of intoxicating liquor.

While instruction 15 mandates that "No person shall[,]" HRS § 291–4(a)(1) is prefaced as follows: "A person commits the offense of driving under the influence of intoxicating liquor if . . . ." Therefore, HRS § 291–4(a)(1) merely codifies one of the methods available in establishing whether a driver was "under the influence of intoxicating liquor[.]" *See also* HRS § 291–5 (1985) (evidence of intoxication). And while this jurisdiction follows the rule that the violation of a statute may constitute evidence of negligence, *see, e.g., Ono v. Applegate*, 62 Haw. 131, 612 P.2d 533 (1980); *Michel v. Valdastri, Ltd.*, 59 Haw. 53, 575 P.2d 1299

(1978), and the jury was properly instructed to this effect, we find that instruction 15's mandatory language gives an inconsistent and misleading impression that the violation of HRS § 291–4(a)(1) constitutes negligence *per se.*

Furthermore, we are troubled by the use of a DUI penal standard in the context of this civil personal injury action. *See* HRE Rules 402 and 403.

It is error to instruct the jury on a state of facts not supported or warranted by the evidence adduced at trial. *Gelber v. Sheraton–Hawaii Corp.,* 49 Haw. 327, 417 P.2d 638 (1966); *Tanuvasa v. City & County,* 2 Haw. App. 102, 626 P.2d 1175 (1981).

Here, no competent evidence was adduced at trial to establish that Laurie was operating the motorcycle while under the influence of intoxicating liquor in violation of HRS § 291–4(a)(1). Accordingly, no statutory violation resulted.

Based on the foregoing reasoning, we hold that the circuit court erred in giving instruction 15.

### III.

### CONCLUSION

The Second Amended Judgment is vacated and the case is remanded for a new trial.

*William J. Rosdil (Phillip L. Carey* and *Paul K. Hamano* with him on the briefs; William J. Rosdil, Attorney at Law, of counsel) for Appellants.

*Michael B. Dabney (Anson K. Lee* with him on the brief), Deputy Corporation Counsels, for Appellee County of Hawaii.