873 P.2d 1321

Frank YAP, Jr., as Special Administrator of the Estate of Mami Kumagai, deceased, Yoshimasa Kumagai, Teiko Kumagai, and Kimi Kumagai, Plaintiffs–Appellants,

v.

CONTROLLED PARASAILING OF HONOLULU, INC., Parasailing Enterprises, Inc., Controlled Parasailing Systems, Inc., Dean Auren; and Roland Ribordy, Defendants–Appellees,

and

John Does 1–10; Jane Does 1–10; Doe Partnerships 1–10; Doe Corporations 1–10; Roe "Non–Profit" Corporations 1–10; and Roe Governmental Entities 1–10, Defendants.

No. 16184.

Supreme Court of Hawai'i.

May 25, 1994.

Henry N. Kitamura (Raymond J. Tam and Walter S. Kirimitsu, with him on the briefs; of Shim, Tam, Kirimitsu & Chang), Honolulu, for plaintiffs-appellants Frank Yap, Jr., as Sp. Adm'r of the Estate of Mami Kumagai, Deceased, and Kimi Kumagai.

Sharon R. Himeno (Kenneth T. Okamoto and Sanford T. Inouye, with her on the briefs; of Price, Okamoto, Himeno & Lum), Honolulu, for plaintiffs-appellants Yoshimasa Kumagai and Teiko Kumagai.

James Kawashima (John T. Komeiji and Charlene K. Ikeda, with him on the briefs; of Watanabe, Ing & Kawashima), Honolulu, for defendants-appellees Controlled Parasailing of Hawaii, Inc., Dean Auren and Roland Ribordy.

Steven K. Hisaka (of Hisaka, Ayabe & Goto), Honolulu, for defendant-appellee Parasailing Enterprises, Inc.

Before MOON, C.J., LEVINSON and RAMIL, JJ., ACOBA, Circuit Court Judge, in place of KLEIN, recused, and AIONA, Circuit Court Judge, in place of NAKAYAMA, recused.

RAMIL, Justice.

Plaintiffs–Appellants Frank Yap, Jr. (Yap), as Special Administrator of the Estate of Mami Kumagai (Mami), deceased, Yoshimasa Kumagai (Yoshimasa), Teiko Kumagai (Teiko), and Kimi Kumagai (Kimi) (collectively Plaintiffs) appeal from the judgment pursuant to a special verdict and the subsequent orders of the circuit court in a case involving a parasailing accident that resulted in Mami's death.

On appeal, Plaintiffs contend that: (1) the circuit court abused its discretion when it did not allow their expert witness to testify that the parasail chair was negligently designed; (2) Plaintiffs should have been allowed to argue a theory of defective design in closing arguments; (3) the opinions and conclusions contained in the United States Coast Guard (Coast Guard) report were erroneously admitted as evidence; (4) the circuit court erred when it admitted the test results from a structurally different chair; (5) the court abused its discretion in allowing Defendants' use of demonstrative evidence; and (6) the circuit court erred when it awarded Defendants–Appellees Controlled Parasailing of Honolulu, Inc. (CPH), Dean Auren (Auren) and Roland Ribordy (Ribordy) attorneys' fees and costs. We agree with each contention.

Accordingly, we vacate the judgment and the award of attorneys' fees and costs and remand for a new trial.

### I. FACTS

#### A. Background

This lawsuit arises out of a parasailing accident that occurred on March 11, 1988 on Waikiki Beach. While on vacation from Japan, Mami and her sister Kimi, were passengers and parasailers on a boat owned by CPH, the Skyrider II (Skyrider). Also on board the Skyrider were four other passengers, crewmember David Morikawa (Morikawa), and Auren. Auren was the pilot of the Skyrider and Morikawa its deckhand.

Mami was the last of the six passengers to ride the parasail. During her ride, she fell out of the parasail chair, falling approximately 150 feet to her death. The parasail chair was not equipped with a seatbelt or any type of restraining device.

The day after the accident, the Coast Guard investigated the incident. Two Coast Guard investigators rode in the Skyrider and in the parasail chair to test the equipment. The investigators, however, used a different line and parasail, because Auren cut the lines of the parasail after the accident in order to untangle the parasail from the Skyrider's propellers.[1] Neither Auren nor Morikawa

---

1. After the accident, the parasail chair and the parasail fell into the water and became tangled in the Skyrider's propellers.

were present during the Coast Guard testing. Thus, Ribordy, the owner and operator of CPH, who was not present during the accident, piloted the Skyrider for the Coast Guard investigators.

A complaint was later filed in the First Circuit Court on March 8, 1989 by Yap, Kimi, and Yoshimasa and Teiko, Mami and Kimi's parents. The complaint was filed against CPH, Ribordy, Auren, Controlled Parasailing Systems, Inc.,[2] and Defendant–Appellee Parasailing Enterprises, Inc. (Enterprises) (collectively Defendants). Enterprises manufactured and sold the parasail chair to CPH.

Prior to trial, Plaintiffs filed a motion *in limine* to exclude any documentary evidence regarding the Coast Guard investigation and to exclude the Coast Guard opinion testimony. The court granted and denied the motion in part. Specifically, the court ruled that it would not allow references to the Coast Guard report with respect to the conclusions and opinions regarding the lack of negligence.

The jury trial ensued and lasted approximately six weeks. During trial, it was established that two people saw Mami fall from the chair: (1) Mark Ross (Ross), an off-duty police officer, who was sitting on a surfboard; and (2) Kimi, who was aboard the Skyrider. Neither Auren nor Morikawa saw Mami fall.

Ross testified that the lines attaching the parasail to the chair "appeared to come off" from "where they were fastened." The parasail then "billowed backwards," the chair "tipped forward," and Mami fell out feet first, "flailing as if trying to climb back into the chair."

Similarly, Kimi testified that the "para[sail] deflated and [that the] cord attached to the chair came down." She further stated that the chair tilted to the left and forward, and Mami slid as if she were coming down a slide.

### B. *Plaintiffs' Expert Witness*

Plaintiffs presented Raymond Bradley (Bradley) as an expert witness. Bradley had a Ph.D. degree in mechanical engineering, with a major in fluid engineering, which included aerodynamics. He worked for the National Aeronautics and Space Administration (NASA) as a systems engineer from 1961 through 1985. During part of his tenure at NASA, Bradley was a manager of the systems engineering division. Essentially, Bradley's job included "troubleshooting and looking for problems and resolving those problems." Bradley worked extensively with the Apollo space program as the systems engineer, and "did a lot of integration work on the parachute system for the Apollo capsule."

Bradley also worked on the design and testing of a "paraglider," which he described as being similar to the parasail chutes used on the Skyrider, except that the paraglider was more "exaggerated, more like a wing." Although not a designer, Bradley stated that he decided what to design and left it up to contractors to fulfill the design per his specifications.

While Bradley admitted that his testimony was based on hypotheticals drawn from the facts elicited from other witnesses and not on actual testing, he also stated that he had examined the parasail chair in June 1990 and conducted tests to determine the chair's center of gravity.

The court allowed Bradley to testify as an expert in aerodynamics, but found that he was not qualified to render an expert opinion as to the design of the parasail chair. Thus, Bradley was not allowed to testify as to the necessity of a seatbelt or restraining device.

During his testimony, Bradley was given the following fact pattern: (1) Mami was 150 feet in the air; (2) Auren was making a left turn with the boat; (3) there was slack in the cable connecting the boat and the parasail chair; (4) the parasail was above the chair; (5) there was a sudden gust of wind; (6) the parasail rose; (7) the front of the parasail chair tipped forward; and (8) Mami fell feet

**2.** Defendant Controlled Parasailing Systems, Inc. was dismissed by stipulation of the parties prior to trial.

first. Bradley was then asked to explain what happened aerodynamically.

Bradley stated that:

no matter which direction [the wind] came from, [the wind] causes the parasail to go up. When the parasail goes up, it pulls on the chair and if you look at the pictures you can see where it's attached, it's about the middle of the chair.

So the parasail is pulling up very suddenly due to the gust right about the middle of the chair, the cable [connecting the chair to the Skyrider] is attached to the front of the chair and it's pulling down.... So when the gust hits the vehicle with the slack in the cable, the parasail goes up, the cable holds down and the chair will have a natural tilt forward.

Bradley was not, however, allowed to state an opinion, based on reasonable engineering probability, as to whether the lack of a restraining device was a defective design.

### C. *The Design of the Parasail Chair*

The parasail chair went through various design changes from its original design to the chair that was eventually shown to the jury. The original chair was designed by Mark McCulloh (McCulloh).[3] McCulloh did not appear at trial, but portions of his deposition were read to the jury. According to his deposition, McCulloh formed Enterprises for the purpose of manufacturing parasailing equipment. McCulloh was the sole employee and stockholder of Enterprises.

McCulloh stated that the parasail chair sold to CPH consisted of a soft, canvas-like sling, which allowed the seat to form a "pocket" that fell below the frame of the chair (original pocket seat chair). According to McCulloh, a seatbelt was therefore unnecessary. In other words, a passenger seated in the pocket would hang below the frame of

the chair and would have to lift himself or herself above the frame of the chair in order to exit the pocket seat.

The original pocket seat chair, however, had been altered by Ribordy prior to the accident (accident chair). The accident chair did not have the soft, canvas-like sling. Instead, the pocket seat had been replaced with a hard styrofoam seat. Ribordy also added six aluminum bars under and in back of the styrofoam seat. Because of the alterations, the accident chair no longer formed a "pocket," and, therefore, the passenger was no longer seated below the frame of the chair.

After the accident, the accident chair was once again altered. According to Ribordy's testimony, after the accident he removed the six aluminum bars and added an additional cross bar across the front of the chair under the rider's knees. The styrofoam seat was also replaced with a pocket seat, which dropped below the frame of the chair when the canvas was stretched (altered chair).[4]

Defendants do not dispute Plaintiffs' claim that Ribordy did not inform Plaintiffs or Bradley that the accident chair had been altered after the accident. Ribordy did, however, inform his own expert, Robert Kadlec (Kadlec), that he had changed the "upholstery" of the chair.

### D. *Kadlec's Testimony*

In preparation for trial, Defendants' expert, Kadlec, conducted tests on a parasail chair in California. However, because Kadlec had not been informed that the accident chair had been altered, the chair tested by Kadlec did not resemble the accident chair, *i.e.*, it did not have the aluminum bars or styrofoam seat. Instead, the chair tested by Kadlec was similar to the original pocket chair, *i.e.*, it had a canvas-like sling (Kadlec's chair).[5] Kadlec's chair was also larger than

---

**3.** According to McCulloh's deposition, his background included one year of college at the Emory–Riddle Aeronautical University, after which he left to pursue a career in golf, and employment as a bartender, lifeguard, and lawn caretaker.

While McCulloh stated that he designed the parasail chair, he could not recall if he consulted anyone regarding his "engineering" questions. He did, however, consult the parties who pur-

chased the parasail chair and former passengers regarding safety.

**4.** Ribordy testified that he installed the canvas type seat because it was more economical, inasmuch as the styrofoam seat deteriorated in the sun.

**5.** Kadlec was not provided with McCulloh's deposition in which McCulloh stated that there was

the accident chair. The accident chair weighed approximately eighty to ninety pounds, while Kadlec's chair weighed 130 pounds. Thus, Kadlec's chair varied substantially from the accident chair.

Kadlec conducted six tests on his chair, three of which were videotaped. During his tests, Kadlec did not consider what the effect of equipment failure—*i.e.*, the breaking or dislodging of the parasail lines—would have on the chair. Based on his test results, Kadlec opined that Mami could not have been dislodged from the chair and that she had to intentionally remove herself from the chair in order for the accident to occur.

Plaintiffs moved to strike all of Kadlec's testimony pertaining to his test results. The court denied the motion and admitted into evidence exhibits relating to Kadlec's tests. The jury was also shown a videotape of the tests.

Contrary to the prior motion *in limine* and over Plaintiffs' objections, the court also allowed Kadlec to address the conclusions and opinions contained in the Coast Guard report. Kadlec testified that the Coast Guard report "said there was no equipment failure and that there was no misconduct." Kadlec made at least six additional references to the Coast Guard's conclusions and opinions.

### E. *Demonstrative Evidence*

Defendants were allowed to bring the altered chair into the courtroom for demonstration purposes only, and it remained in the courtroom for the remainder of the trial. Over Plaintiffs' objection, the court also allowed Auren to sit in the altered chair to demonstrate Mami's position prior to her fall.

Although the altered chair was not admitted into evidence, the court allowed, over Plaintiffs' objection, each juror to touch and sit in the altered chair, and to touch a styrofoam seat that had been mailed to Defendants by McCulloh.

Plaintiffs argued that the styrofoam seat presented at trial appeared weathered and exhibited deterioration from the sun and was therefore softer than the accident seat. There were also at least three holes in it, and

a fundamental difference in safety considerations

at least one cut, which evidenced use. The styrofoam seat used during the accident was essentially new, having been in operation for only two to three months prior to the accident.

### F. *Special Verdict*

By special verdict, the jury found no negligence on the part of Auren or CPH. It also found that Mami was not contributorily negligent. While it did find Enterprises negligent in its failure to warn or in its design of its parasailing apparatus, it concluded that this negligence was not the legal cause of the accident.

In spite of finding no legal causation, the jury found Enterprises one hundred percent liable for damages. Thereafter, the circuit court determined that the special verdict question regarding the percentage of negligence was mere surplusage, because the jury determined that Enterprises' negligence was not the legal cause of Mami's injuries. Thus, the court entered judgment pursuant to the special verdict in favor of all Defendants.

On May 27, 1992, the court entered an amended judgment and included an award of attorneys' fees and costs to CPH, Auren and Ribordy.

Plaintiffs timely filed a notice of appeal on May 29, 1992.

## II. *DISCUSSION*

### A. *Bradley's Testimony*

■ Plaintiffs contend that the circuit court abused its discretion when it did not allow Bradley to testify that the chair was negligently designed. We agree.

■ Initially, it is for the circuit court to decide whether an expert witness has such skill, knowledge, or experience in the field in question such that his or her opinion or inference-drawing would probably aid the trier of fact in arriving at the truth. *Larsen v. State Savings and Loan Association*, 64 Haw. 302, 304, 640 P.2d 286, 288 (1982) (citations omitted); *see also Wakabayashi v.*

between a hard seat and a canvas sling.

*Hertz Corp.,* 66 Haw. 265, 272, 660 P.2d 1309, 1314 (1983).

It is not necessary, however, for the expert witness to have the highest possible qualifications to enable him or her to testify as an expert. *Larsen,* 64 Haw. at 304, 640 P.2d at 288 (citations omitted). Once the circuit court makes the initial determination of the requisite qualifications, the extent of the expert's knowledge goes to the weight rather than the admissibility of his or her testimony. *Id.* (citations omitted).

Pursuant to *Larsen,* we must determine whether the circuit court abused its discretion when it made the initial determination that Bradley was not qualified to testify as an expert regarding the necessity of a restraining device. A trial court abuses its discretion when it clearly exceeds bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party. *Kaneohe Bay Cruises, Inc. v. Hirata,* 75 Haw. 250, 258, 861 P.2d 1, 6 (1993) (citations omitted).

In the instant case, while Bradley admittedly did not design parasails, he held a doctorate in mechanical engineering, with a major in fluid engineering. Bradley's expertise was the study of aerodynamic devices, spotting problems, and finding solutions. The fact that he had not actually designed a parasail should have gone to the weight of his testimony and not to its admissibility. Moreover, his skill, knowledge, and experience in the area of "troubleshooting" was such that his opinions or inference-drawing would probably aid the trier of fact in arriving at the truth. *See State v. Batangan,* 71 Haw. 552, 556, 799 P.2d 48, 51 (1990) (expert testimony aids the trier of fact by providing a resource for ascertaining the truth in areas outside the knowledge of the average trier of fact).

Accordingly, Bradley was more than qualified as an expert to testify about the issue of negligent design. Thus, the circuit court abused its discretion when it disqualified him

from testifying as to the necessity of a restraining device on the accident chair.[6]

### B. *The Coast Guard Report*

Plaintiffs next argue that the circuit court committed prejudicial error by allowing Kadlec to testify regarding the Coast Guard's conclusions and opinions in violation of Plaintiffs' motion *in limine.* We agree.

Plaintiffs based their motion *in limine* on *Huber v. United States,* 838 F.2d 398, 403 (9th Cir.1988), which held that the conclusions and recommendations contained in Coast Guard investigative reports were inadmissible as evidence in a civil action arising out of an accident. The Ninth Circuit Court based its decision on the Coast Guard Rules, which provide that:

> "[t]he investigations of marine casualties and accidents and the determinations made are for the purpose of taking appropriate measures for promoting safety of life and property at sea, and are *not intended to fix civil or criminal responsibility.*"

*Huber,* 838 F.2d at 402 (quoting 46 C.F.R. § 4.07–1(b) (1986)) (emphasis in original).

The Ninth Circuit Court reasoned that:

> the Coast Guard established a set of procedures to be followed by its personnel whenever a marine casualty or accident takes place, including a formal investigation of the incident.... The Coast Guard has also directed, consistent with its statutory mandate to promote marine safety, that reports of such investigations shall not be used as evidence to assign civil or criminal responsibility for accidents. The reason for this is obvious: were post-accident investigation reports admissible evidence in a later civil proceeding for damages, the investigators might well be reluctant to be completely open and candid in the report, a result which could have adverse consequences for public safety.

---

**6.** Plaintiffs also contend that the circuit court abused its discretion when it refused to allow Plaintiffs to argue a defective design in closing arguments. The court ruled as such because it felt there was no evidence regarding a defective

design. Because we conclude that the court abused its discretion when it limited Bradley's testimony by excluding any reference to a design defect, we need not reach this issue.

*Id.* (citations omitted). Thus, the *Huber* court held that the Coast Guard reports were inadmissible as evidence in private litigation. *Id.* at 403.

At the hearing on Plaintiffs' motion *in limine,* the circuit court ruled that it would allow Defendants to present the Coast Guard's finding that Auren did not violate any Coast Guard rules or regulations, but that it would not permit testimony regarding negligence. Contrary to the circuit court's ruling, Kadlec stated during trial that he reviewed the Coast Guard report and that the report found no equipment failure and no misconduct.

Defendants concede that the court granted the motion *in limine* with respect to any reference to "negligence" or "fault," but contend that the court also reserved the right to rule on other questions at trial. Enterprises further contends that the circuit court did not err because it simply allowed Kadlec to testify as to how he used the report to form the basis of his opinion. We disagree with Defendants.

■ While it is true that Kadlec did not specifically use the words, "negligence" or "fault" with respect to the Coast Guard report, a statement that there was no misconduct or equipment failure impliedly addresses issues of negligence and fault. Thus, Kadlec's references to the Coast Guard report were in violation of the court's previous partial grant of the motion *in limine.*

As stated by the Coast Guard Rules, its reports were not intended to fix civil liability and therefore should not have been presented to the jury. Moreover, it is clear from the record that Kadlec's references to the Coast Guard report were considered by the jury, as it requested to see the Coast Guard report during its deliberations.[7]

We therefore hold that the circuit court committed reversible error when it allowed Kadlec to make several references to the Coast Guard's findings of no equipment fail-

ure or misconduct in violation of its motion *in limine.*

### C. Kadlec's Test Results

Plaintiffs contend that the circuit court abused its discretion by admitting Kadlec's test results, because the elements of Kadlec's tests were not "substantially similar" to the elements existing at the time of the accident. We agree.

■ Previously, in *Loevsky v. Carter,* 70 Haw. 419, 426–27, 773 P.2d 1120, 1125 (1989), this court held that:

> "[w]hen a test or experiment is an attempt to reenact the original happening, the essential elements of the experiment must be substantially similar to those existing at the time of the accident." *Carr v. Suzuki Motor Co.,* 280 Ark. 1, 3, 655 S.W.2d 364, 365 (1983). And "[a]lthough the decision whether to admit evidence of experiments rests largely in the sound discretion of the trial judge, it is well settled that reconstruction experiments are incompetent unless the essential elements of the experiment are shown to be substantially similar to those existing at the time of the accident." *Hubbard v. McDonough Power Equip., Inc.,* 83 Ill.App.3d 272, 280, 38 Ill.Dec. 887, 894, 404 N.E.2d 311, 318 (1980) (citations omitted).

The appeal in *Loevsky* arose out of an accident involving a motorcycle driven by the defendant Laurie Carter. Carter was negotiating a curve when she hit a guardrail and struck the plaintiff. Carter claimed that she lost control when she rode over gravel. *Id.* 70 Haw. at 421–422, 773 P.2d at 1122–23.

During the defendant County of Hawai'i's (County) case-in-chief, it called Dr. Bolster, who was qualified as an expert in the area of accident reconstruction. *Id.* at 425, 773 P.2d at 1124. Through Bolster's testimony, the County was able to admit a videotape into evidence, which contained four crucial tests. *Id.* It was undisputed that the motorcycle tests "neither duplicated the exact conditions

---

**7.** The circuit court denied the request, stating that the Coast Guard report was not admitted into evidence for reasons based on law. The court then instructed the jury to rely on its collective recollection. Thus, because the court told

the jury to rely on its recollection, the jury may have relied on Kadlec's statements that the Coast Guard found no equipment failure or misconduct, both of which suggest a finding of no negligence or fault.

nor substantially resembled the actual accident." *Id.* at 427, 773 P.2d at 1125.

The County argued that the tape was admitted to demonstrate the principle that one could negotiate the curve in question at a speed of approximately 40 m.p.h., even if there was an overabundance of gravel, and not for reenactment purposes. *Id.* at 427–28, 773 P.2d at 1125.

This court disagreed and concluded that the videotape amounted to a "veiled attempt to successfully re-create the motorcycle ride under controlled conditions favorable to County[,]" which left the jury with the "lasting visual impression" that the presence of gravel should not have been a contributing factor. *Id.* at 428–29, 773 P.2d at 1126 (citation omitted). "This flawed reasoning ... was premised in large part on the distinct factual dissimilarities between" the accident and the reenactment. *Id.* at 429, 773 P.2d at 1126. Thus, this court held that the circuit court abused its discretion in admitting the tape and allowing the jury to view its contents. *Id.*

■ In the instant case, Kadlec's tests were likewise an attempt to re-create the parasail ride under conditions favorable to Defendants. Kadlec conducted reconstruction tests to determine whether it was possible for Mami to fall out of the parasail chair. It is undisputed that he did not test the accident chair, but instead tested a chair that allowed the passenger to sit below its frame. Kadlec's chair was also heavier and larger than the accident chair.

Not only did Kadlec test a structurally different chair; he also failed to test the effects of a broken line. Kadlec reasoned that the possibility of a broken line would not change his opinion because "[t]here's absolutely no evidence that there was a failure of any equipment. The Coast Guard report made an inspection and official finding. Furthermore, the witness testimony was such that it indicates there was no equipment failure in my opinion."[8]

---

8. The Coast Guard did not test the lines and parasail used in the accident, because Auren had cut the lines. It is not clear, however, whether the Coast Guard examined the cut lines to determine whether the line did in fact break.

These conditions allowed Kadlec to successfully re-create the parasail ride under controlled conditions favorable to Defendants and left the jury with the lasting visual impression that a passenger could not have fallen out of the chair. Moreover, Kadlec's test results were incompetent under the *Loevsky* test because the essential elements of the test were not substantially similar to those existing at the time of the accident. Thus, we hold that the circuit court abused its discretion by admitting Kadlec's test results.

### D. *Demonstrative Evidence*

Plaintiffs appeal Defendants' use of demonstrative evidence during trial. Plaintiffs contend that the circuit court abused its discretion when it allowed: (1) the jury to view the video of Kadlec's tests; (2) the altered chair to remain in the courtroom; (3) Auren and the jury to sit in the altered chair; and (4) the jury to touch the styrofoam seat.

We have recognized that:

> "[d]emonstrative evidence appeals directly to the senses of the trier of fact, [and] it is today universally felt that this kind of evidence possesses an immediacy and reality which endow it with particularly persuasive effect." E. Clearly, *McCormick on Evidence* § 212, at 664 (3d ed. 1984) (footnote[s] omitted). "At the same time, ... its use raises certain problems for a juridical system the mechanics of which are essentially geared to the reception of *viva voce* testimony of witnesses." *Id.* Thus, trial judges have traditionally been afforded "broad discretion in ruling upon the admissibility of many types of demonstrative evidence." *Id.* at 665 (footnote omitted).

*Monlux v. General Motors Corp.*, 68 Haw. 358, 363, 714 P.2d 930, 933 (1986).

### 1. *Kadlec's Videotape*

■ During Kadlec's direct examination, Defendants showed a videotape depicting Kadlec's tests. The circuit court allowed the jury to view the videotape to "assist the jury

in understanding the principles used by Dr. Kadlec." As discussed *supra,* Kadlec's tests results were incompetent evidence. Thus, the videotape of Kadlec's tests was likewise incompetent and therefore inadmissible.

As noted by this court in *Monlux,* demonstrative evidence "possesses an immediacy and reality which endow[s] it with particularly persuasive effect." *Monlux,* 68 Haw. at 363, 714 P.2d at 933. Given the fact that the test results and therefore the videotape were inadmissible, allowing the jury to view the videotape was highly prejudicial with no real probative value. *See* Hawai'i Rules of Evidence (HRE) Rule 403 (1985). By viewing the tape, the jury was left with the misleading visual impression that Mami could not have fallen out of the chair. Thus, the circuit court abused its discretion when it allowed the jury to view Kadlec's videotape.

## 2. *Altered Chair in the Courtroom*

Defendants brought the altered chair into the courtroom for demonstrative purposes. Plaintiffs did not object when the chair was brought in, but did inquire later whether Defendants would remove the chair. The altered chair, however, remained in the courtroom, because Defendants represented that they intended to use it during closing arguments.

Because Plaintiffs did not object to the introduction of the chair, or to having the chair remain in the courtroom, they ask us to find plain error. HRE Rule 103(a) (1985).[9] The facts simply do not establish plain error. Both Plaintiffs and Defendants repeatedly reiterated that the chair had been altered and that it was missing the original seat and the aluminum bars. The simple fact that the chair remained in the courtroom was not so prejudicial that it affected Plaintiffs' substantial rights.

## 3. *Sitting in the Altered Chair*

On the other hand, allowing the jurors to sit in the altered chair was a different matter. On Defendants' motion, the circuit court allowed each juror to sit in the altered chair over Plaintiffs' objection. The court also allowed, over Plaintiffs' objection, Auren to sit in the chair to show the position of Mami's body prior to her fall. Plaintiffs contend this was an abuse of discretion. We agree.

According to the designer of the chair, there was a fundamental difference between the styrofoam seat used during the accident and the canvas seat used on the altered chair. The canvas seat was a sling which formed a pocket and allowed a passenger to sink below the frame of the chair, while the styrofoam seat did not create such a pocket.

The chair in the courtroom was also missing the six aluminum bars which further hampered the ability of the seat to create a pocket. The net effect of the alterations allowed the jurors and Auren to "sink" into the chair, creating an illusion of safety and supporting Kadlec's theory that Mami had to pull herself out of the chair in order to fall. This was misleading and served no real probative value of the accident chair inasmuch as the two chairs were substantially different.

Accordingly, the circuit court abused its discretion when it allowed Auren and the jurors to sit in the altered chair.

## 4. *The Styrofoam Seat*

Over Plaintiffs' objection, Defendants were allowed to use and the jury allowed to touch a styrofoam seat for demonstrative purposes. The styrofoam seat was introduced during the testimony of Ribordy, who stated that it was not the same styrofoam seat used during the accident, but that the texture was the same.

9. HRE Rule 103 (1985) provides in part that:
    (a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits ... evidence unless a substantial right of the party is affected, and:
    (1) Objection: In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]
    ....
    (d) Plain error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

While the circuit court is afforded broad discretion in ruling upon the admissibility of demonstrative evidence, the circuit court abused its discretion in allowing the jury to touch the styrofoam. According to the record, Defendants obtained the styrofoam seat from McCulloh, and there was no testimony as to the age of seat. Even Ribordy admitted that the styrofoam seat used in trial differed from the accident seat because it was rougher, weathered and had holes in it. The use of the seat becomes particularly prejudicial when combined with the court's statement that it would allow the jury to touch the styrofoam so that the jury could "get the feel of the seat that was used at the time of the accident."

Clearly, it was not the same seat used at the time of the accident. Thus, because the texture of the styrofoam was in issue, the court abused its discretion by allowing the jury to touch the weathered chair.

### E. *Attorneys' Fees and Costs*

Defendants CPH, Auren and Ribordy were awarded attorneys' fees and costs. However, because we vacate the judgment pursuant to the special verdict and remand for a new trial, we also vacate the award of attorneys' fees and costs.

## III. *CONCLUSION*

Based on the foregoing, we hold that the court: (1) abused its discretion when it did not allow Bradley to express an expert opinion as to whether the lack of a restraining device was a negligent design; (2) erred when it allowed Kadlec to state that the Coast Guard report indicated no equipment failure or misconduct; (3) abused its discretion by admitting Kadlec's test results; and (4) abused its discretion when it showed Kadlec's video, allowed the jury and Auren to sit in the altered chair, and allowed the jury to touch the styrofoam seat for demonstrative purposes.

Accordingly, we vacate the judgment pursuant to the special verdict and remand for a new trial.[10] We also vacate CPH's, Auren's, and Ribordy's awards of attorneys' fees and costs.

10. Plaintiffs also contend that the answers to the special verdict were irreconcilable and that they were therefore entitled to a new trial. Because we vacate the judgment pursuant to the special verdict and remand for a new trial, we do not reach this issue.