922 P.2d 1041

**Anh Hue To LAU, Personal Representative of the Estate of Tommy Ho Lau; Anh Hue To Lau, Individually and as Prochein Ami of Howard Ho–Wick Lau, a minor; Anh Tu and Chieu Vinh Luu, Plaintiffs–Appellants,**

v.

**ALLIED WHOLESALE, INC., dba Allied International; and Costco Wholesale Corporation, Defendants–Appellees,**

and

**John Does 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe "Non–Profit" Corporations 1–10; Doe Partnerships 1–10; and Doe Governmental Entities 1–10, Defendants.**

No. 16818.

Intermediate Court of Appeals of Hawai'i.

Aug. 20, 1996.

Anthony H. Yusi and Walter K. Horie (Horie & Yusi, of counsel), and Jennifer M. Yusi (Rush Moore Craven Sutton Morry & Beh, of counsel), on the briefs, Honolulu, for plaintiffs-appellants.

Craig K. Furusho, on the brief, Honolulu, for defendants-appellees.

Before BURNS, C.J., and ACOBA and KIRIMITSU, JJ.

KIRIMITSU, Judge.

This appeal involves a products liability case brought by plaintiffs-appellants Anh Hue To Lau, personal representative of the estate of Tommy Ho Lau (Lau), and Lau's survivors (Plaintiffs). Lau died from severe burns sustained in an accident involving a parts washer machine distributed by Defendants–Appellees Allied Wholesale, Inc., dba Allied International (Allied), and sold by Costco Wholesale Corporation (Costco) (collectively, Defendants).

## I. BACKGROUND

Lau was employed at Apollo Systems, Inc. (Apollo), a painting and waterproofing company owned by Peter Chun (Chun). On September 17, 1989, Chun purchased a parts washer from Costco. The parts washer was manufactured in Taiwan, distributed by Allied, and designated as model 47–PWDT. The parts washer's main components consisted of a tub and an electric pump attached to the tub. The tub is filled with solvent and one way it cleans miscellaneous parts is to soak them in the tub while the electric pump agitates the solvent. The washer's main safety feature is a safety lid which has a fusible link assembly. In the event of a fire, the solder holding the links together is supposed to melt, causing the links to separate. This triggers a chain of events that eventually causes the lid to close and extinguish the fire.

On September 18, 1989, the parts washer was assembled at the Apollo warehouse by Jim Strombach (Strombach), a painting supervisor. The parts washer was placed against the back wall of the left-hand-center of the warehouse, just underneath a mezzanine. The mezzanine was ten to twelve feet above the floor. Strombach poured some solvent in the tub and ran the pump for fifteen minutes to ensure that it was working. He then took four to five tips from paint spray guns that were soaking in lacquer thinner and cleaned them using the parts washer. After he finished cleaning the spray tips, Strombach left the solvent in the tub, turned off the machine and locked up for the night.

The following morning, on September 19, 1989, another Apollo employee, Rick Felicilda (Felicilda), used the machine to clean several pairs of scissors. When Felicilda turned off the machine, a "flash" occurred near the pump housing igniting the solvent in the tub. A tower of flames shot up from the tub. Chun came down the stairs from his mezzanine office. He crawled on the floor towards the legs of the parts washer and began to move the washer away from the mezzanine area by pulling on the legs. Lau, who was also there, approached to help Chun move the machine. The parts washer tipped over and the flaming solvent splashed on Lau, who ignited like a "fireball." Lau died fifty-two days later.

On May 9, 1990, Plaintiffs filed a complaint against Defendants alleging strict products liability, negligence in design and manufacture, and breach of warranty of merchantability. Jury trial began on June 18, 1992. Plaintiffs presented evidence showing three areas of defect in the parts washer. First, vapors generated by the solvent in the tub can migrate into the switch housing assembly, presenting the risk that a spark from the switch will ignite the vapors. Second, the warnings on the parts washer were inadequate. Finally, the fusible link assembly designed to close the lid on the parts washer in the event of fire was untested.

Defendants countered by presenting evidence suggesting misuse of the parts washer as the cause of the fire. Defendants also presented evidence showing that the warning labels were adequate for a commercial user like Apollo, and that the fusible link assembly was not allowed enough time to activate during the fire.

Plaintiffs moved for directed verdicts at the end of its case and at the close of the evidence. The trial court denied both motions. On July 9, 1992, the jury returned its special verdict indicating that, (1) the parts washer was not defective; (2) Allied was not negligent; (3) Defendants did not breach any implied warranty of fitness for ordinary use; and (4) Lau was not contributorily negligent.

On July 21, 1992, Plaintiffs moved for a mistrial based on juror misconduct. On August 5, 1992, Plaintiffs moved for a judgment notwithstanding the verdict (JNOV) because the verdict was not supported by any substantial evidence. Alternatively, Plaintiffs moved for a new trial because the jury considered evidence that was erroneously admitted. Both motions were denied. After Plaintiffs' motion for reconsideration was also denied, the trial court entered its written orders denying Plaintiffs' motions on January 15, 1993. On the same day, Judgment was entered in favor of Defendants. Plaintiffs filed a timely notice of appeal on February 3, 1993.

## II. DISCUSSION

Plaintiffs challenge the trial court's denial of their (1) motions for directed verdict, (2) motion for a mistrial, and (3) motion for JNOV and/or a new trial.

### A. Directed Verdict and JNOV Motion

Plaintiffs argue that they are entitled to a directed verdict or a JNOV because the competent evidence established, under principles of negligence, strict liability, and breach of warranty of merchantability, that the parts washer was defective.

 It is well settled that

"denials of directed verdict or JNOV motions [are reviewed] de novo. Verdicts based on conflicting evidence will not be set aside where there is substantial evidence to support the jury's findings. We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion.

In deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment."

Carr v. Strode, 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995) (quoting Richardson v. Sport Shinko (Waikiki Corp.), 76 Hawai'i 494, 503, 880 P.2d 169, 178 (1994)). Thus, "[w]here there is conflicting evidence, or there is insufficient evidence to make a one-way verdict

proper, [JNOV] should not be awarded." *Id.* at 487, 904 P.2d at 501 (internal quotations and citations omitted).

Based upon our review of the records, we find that there was substantial evidence to support the jury's findings and conclude that Plaintiffs' arguments have no merit. Accordingly, we hold that the trial court properly denied Plaintiffs' JNOV and directed verdict motions.

### B. *Motion for a New Trial and Motion for Mistrial*

As an alternative to their JNOV motion, Plaintiffs moved for a new trial alleging that the verdict was against the manifest weight of the evidence due to errors in the admission of evidence at trial and misconduct by the jury and defense counsel. The trial court denied Plaintiffs' motion for a new trial. For the reasons set forth below, we reverse.

### 1. *Standard of Review*

Both the grant and the denial of a motion for new trial are within the trial court's discretion, and we will not reverse that decision absent a clear abuse of discretion. *Richardson,* 76 Hawai'i at 503, 880 P.2d at 178; *see also Stahl v. Balsara,* 60 Haw. 144, 152, 587 P.2d 1210, 1215 (1978). An abuse of discretion occurs "where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 114, 839 P.2d 10, 26, *reconsideration denied,* 74 Haw. 650, 843 P.2d 144 (1992). Unlike motions for a directed verdict or a JNOV, the movant need not, on a motion for new trial, convince the court to rule that no substantial evidence supports its opponent's case, but only that the verdict rendered for its opponent is against the manifest weight of the evidence. *Richardson,* 76 Hawai'i at 503, 880 P.2d at 178.

*Carr,* 79 Hawai'i at 488, 904 P.2d at 502.

### 2. *Evidence Issues*

Plaintiffs argue that a new trial is necessary because the jury based its verdict on inadmissible evidence. They allege that the trial court erred in admitting (1) evidence on the lack of prior accidents involving the parts washer product; (2) expert testimony on, and an accompanying videotape of, tests and experiments; (3) expert testimony on "human factor[ ] matters"; and (4) expert testimony based on a report that was not provided to Plaintiffs until the eve of trial.

We will primarily discuss (2) above. Evidence presented at trial showed that the following warning was printed on the parts washer's lid: "—Caution—Do not use solvents or degreasers with a flashpoint below 105° F. Use only those cleaning solutions with a petroleum base." Strombach testified that he filled the parts washer tub only with "Klean–Strip" mineral spirits which has a flashpoint of 105° F.[1] Contradictory expert testimony revealed that lacquer thinner, which has a flashpoint of 29° F, was present along with the paint thinner in the residue taken from the parts washer. One of the main issues at trial, therefore, was whether the parts washer only contained solvent with the proper flashpoint and, if it did not, whether this contributed to the cause of the fire.

Ronald Weisel (Weisel) was called by Defendants and was qualified as an expert in chemistry, failure analysis and product liability investigation and testing. Weisel described a series of tests and experiments that he conducted for this litigation. First was a test using a parts washer similar to the one involved in the present case. The test was designed to determine if pure mineral spirits would produce enough vapor to start a fire when the parts washer is turned on and off (1) while filled with a 100% solution of mineral spirits and (2) after the switch housing and switch is doused with the 100% mineral spirits solution ("vapor/switch test"). The other experiment involved small containers, resembling tuna cans, which contained either mineral spirits or lacquer thinner or a mixture of both and a lighted match. This experiment was designed to determine at "what point or

---

1. "Klean Strip" is the name of the solvent's manufacturer.

at what percentage of solution" would a mixture of lacquer thinner and mineral spirits ignite when a lighted match is placed around the containers ("ignitability experiments"). Both the vapor/switch test and the ignitability experiments were conducted in an environment where the temperature of the room and the solutions were around eighty-five degrees Fahrenheit because, according to Weisel, that was "the temperature at the time of the incident." Collaborating with Weisel on these tests and experiments was Sydney Woodcock (Woodcock), another defense witness qualified as an expert in "[f]ailure analysis, fire investigation ... expert in the area of flammable materials and in the area of fire safety system design and implementation." The tests and experiments were videotaped and the videotape was shown to the jury without audio during Weisel's testimony.[2]

### a. Use of videotape as evidence at trial

■ Generally, the decision to admit various types of demonstrative evidence is left to the discretion of the trial court. *Yap v. Controlled Parasailing of Honolulu, Inc.*, 76 Hawai'i 248, 256, 873 P.2d 1321, 1329 (1994) (citing *Monlux v. General Motors Corp.*, 68 Haw. 358, 363, 714 P.2d 930, 933 (1986)). Videotapes depicting a particular incident can be used as demonstrative evidence at trial. A. Bowman, *Hawai'i Rules of Evidence Manual* § 901–2F(1) (1990); *see also Yap, supra,* (depicting tests of a chair used for parasailing); *Loevsky v. Carter*, 70 Haw. 419, 773 P.2d 1120 (1989) (depicting a series of motorcycle rides).

The controlling authority in this jurisdiction regarding the admissibility of videotape evidence is the *Loevsky* case. Professor Bowman, citing *Loevsky*, observed that although "there is always the possibility that the depiction itself is somehow distorted or flawed[,] ... the issue [surrounding the use of videotapes at trial] will be mainly whether the depiction bears substantial similarity to

the events in litigation and whether the strain on [Hawai'i Rules of Evidence (HRE) ] Rule 403 is tolerable." A. Bowman, at § 901–2F(1). A careful reading of *Loevsky* reveals that these two issues were intended to address separate questions of admissibility. The first question is whether the videotape depicts a reenactment or reconstruction of an incident. The second relates to whether the tape shows tests or experiments explaining a scientific principle. We take a close look at the *Loevsky* case to clarify the analysis for this particular evidentiary problem.

#### i. Preview of the videotape

■ As indicated above, the admission of demonstrative evidence is firmly lodged within the trial court's discretion. Therefore, before going into the specifics of the admissibility analysis, we reiterate the Hawai'i Supreme Court's admonition in *Loevsky* for the trial court to preview the contents of the videotape before ruling on its admissibility. "Where the admissibility of the contents of a visual recording is at issue in a judicial proceeding, we *direct* that [Hawai'i] trial courts in the future *undertake their best efforts* in attempting to view the subject visual recording prior to ruling on its admissibility." *Loevsky,* 70 Haw. at 424 n. 6, 773 P.2d at 1123 n. 6 (emphases added). Although the language used by the supreme court falls short of making the preview an absolute requirement, we believe that to be able to reach the correct decision on admissibility the trial court *must* preview the contents of any film or videotape offered in evidence.

#### ii. Reconstruction of the incident

■ The *Loevsky* court indicates that when a videotape depicts an experiment reconstructing a particular incident, the videotape will only be admissible if there is a showing that the essential elements of the depicted experiment are substantially similar

---

**2.** While on the stand during direct testimony, Weisel was given the remote control for the video cassette player and was allowed to fast forward the video tape "through those areas where there are no test results being documented." Plaintiffs' counsel did not object to this procedure, but reserved the right to show the skipped portions during cross-examination. The videotape was played showing only video and no audio while Weisel described to the jury what the video picture purportedly showed.

to the incident it purports to reenact. *Loevsky,* 70 Haw. at 427, 773 P.2d at 1125. In other words, for videotape evidence to be admissible to show a reconstruction experiment, its contents must be substantially similar to the actual incident.

■ In *Loevsky,* the supreme court concluded that the videotape was not admissible "for reenactment purposes" because the tests depicted on the tape did not "duplicate[ ] the exact conditions nor substantially resemble[ ] the actual incident." *Id.* Although not admissible as a reenactment, the videotape may still be admissible for another purpose.

### iii. *Explanation of scientific principles*

■ The Hawai'i Supreme Court stated that:

> "Films or videotapes of experiments by an accident reconstructionist, physicist, engineer, or other witness qualified as an expert on the cause of accidents, offered merely to illustrate the principles used in forming an opinion, do not require strict adherence to the facts and are admissible in evidence, provided such films or tapes are not misleading in and of themselves and provided it is made clear that they are offered only as illustrations of the principles involved."

*Loevsky,* 70 Haw. at 428, 773 P.2d at 1126 (quoting 3 C. Scott, *Photographic Evidence* § 1317 (2d ed. Supp. 1987)) (emphasis and citations omitted). Thus, a filmed or videotaped experiment is relevant as long as it is offered to illustrate principles used in forming an opinion. Its admissibility depends on whether "it is misleading" and not on whether its contents are "substantially similar" to the incident at issue. *Id.* The question of whether the videotape's contents are "misleading" essentially involves the HRE Rule 403 inquiry regarding whether the videotape's "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ."

In *Loevsky,* the defendant was operating a motorcycle while carrying a passenger. The motorcycle veered out of control while going through a curve at speeds of approximately thirty to thirty-five miles per hour (m.p.h.). The motorcycle hit a guardrail and then struck the plaintiff. The passenger testified at his deposition and at trial that the motorcycle slid when its front wheel contacted gravel that he saw was on the curve. Based on the passenger's deposition testimony, one of the issues that arose at trial was whether gravel, if present on the curve, would be a contributing factor to the accident. *Id.* at 428 n. 10, 773 P.2d at 1125 n. 10.

The co-defendant, County of Hawai'i, hired an expert in motorcycle accident reconstruction to conduct test runs on the accident scene using the same motorcycle involved in the accident. The expert placed "three bags of fairly coarse dirt" on the curve and rode the motorcycle through the curve. The test runs were videotaped and the majority of them were conducted with only the rider and no passenger on the motorcycle. The purpose of the test was "to demonstrate the principle that one can negotiate this roadway and curvature at speeds of approximately 30 m.p.h. even if there is a rather over abundance of gravel." *Id.* at 425, 773 P.2d at 1124.

The tape's visual contents include four crucial test runs described as follows:

1) the solo rider travelling around the curve, near the shoulder of the lane, over the pre-placed gravel, at 32–34 m.p.h.;

2) the solo rider travelling the same route, over the pre-placed gravel, at a diminished speed of 30–31 m.p.h.;

3) the solo rider travelling the same route, over the pre-placed gravel, at a diminished speed of 29–30 m.p.h.;

4) the fourth run, shot from the video camera being held by . . . a passenger behind the test rider . . ., recording the motorcycle's path while travelling the same route, close to, *but not* over the pre-placed gravel, at . . . estimated speed of approximately 30 m.p.h.

*Id.* at 426, 773 P.2d at 1124–25. The videotape was admitted into evidence over the plaintiff's objections and shown to the jury while one of the accident reconstruction experts was on the stand. *Id.* at 425, 773 P.2d at 1124.

On appeal, the Hawai'i Supreme Court held that the videotape was inadmissible as evidence because "[t]he prejudicial and misleading impact of the tape's contents on the jury ... far outweighed its probative value, if any." *Id.* at 428, 773 P.2d at 1126 (citing HRE Rule 403). In reaching this conclusion, the supreme court characterized the videotape's contents as "a veiled attempt to successfully re-create the motorcycle ride under controlled conditions favorable to County." *Id.* The supreme court explained:

> The conclusion is inescapable that, after viewing the tape, the mind-set of the jury was that, since the motorcycle did not slide down during the crucial test runs, one could safely travel around the curve and through the rock and gravel area.
>
> Given this lasting visual impression upon the jury, a logical inference could be made that the presence of gravel, if any, on the roadway during the actual accident, *should* not have been a contributing factor to the motorcycle sliding down and subsequently causing [the] [p]laintiff's injuries. This flawed reasoning, however, was premised in large part on the distinct factual dissimilarities between the actual accident on December 23, 1984 and the October 15, 1986 reenactment.

*Id.* at 428–29, 773 P.2d at 1126 (citation, quotation marks and brackets omitted). The factual dissimilarities include:

1) the amount of gravel placed on the roadway ... was largely a "subjective determination," since County's position was that gravel was not present at the location where the motorcycle slid down on the accident date;

2) traffic was held up in both directions ... while [the expert] directed the test runs;

3) the test rider had prior notice of the pre-placed gravel on the roadway;

4) the test-rider rode solo during the first three crucial runs through the pre-placed gravel; and

5) the test rider ... drove past the curve at a different, more circular angle.

*Id.* at 427 n. 9, 773 P.2d at 1125 n. 9. Also, the test runs were conducted two years after

the accident, which, the supreme court presumed, "altered to an unknown extent the conditions surrounding the curve." *Id.*

These noted factual dissimilarities, in turn, rendered the tape's relevancy in establishing County's asserted principle suspect at best. *See* HRE Rules 401 and 402. Moreover, we find it obvious that County could have employed less burdensome alternatives, such as adequate cross-examination at [the passenger's] deposition or at trial, in attempting to rebut [the passenger's] deposition statement, ..., which in effect was nothing more than a lay witness's opinion. *See* HRE Rule 701. Also, we doubt whether [the passenger's] statement would have assisted the jury in its "determination of a fact in issue." *Id.*

*Id.* at 529, 773 P.2d at 1126.

■ From this analysis, we gather the relevant factors to consider when weighing the probative value of a videotape against its prejudicial impact. Regarding probative value, the trial court must address the "actual need for the evidence[ ] [and the] availability of other evidence on the same issues[.]" Commentary to HRE Rule 403. When the need for the evidence is low and when alternative means to present the evidence exist, then "prejudice to an opponent can be said to be 'unfair' when the proponent of the evidence could prove the fact by other, non-prejudicial evidence." 22 C. Wright & K. Graham, *Federal Practice and Procedure: Evidence,* § 5214 at 269 (1978) (footnote omitted).

The other part of the balance involves the prejudicial impact of the evidence. "Unfair prejudice ... means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily an emotional one." Commentary to HRE Rule 403 (citation and internal quotation marks omitted). It is this part of the admissibility question that makes previewing the videotape of critical importance. The trial court must view the tape to determine how the jury would react to the videotape's contents in order to properly exercise its discretionary authority to admit or reject the videotape as evidence. *Hurt v. Coyne Cylinder Co.,* 956 F.2d 1319, 1328 (6th Cir.1992) ("There is nothing im-

proper in the court's making a subjective determination that the film would be prejudicial; subjectivity is an inherent part of discretionary determinations.")

At this instance, the trial court must view the tape to determine what "lasting visual impression" the contents of the tape will create for the jury and the "logical inference" to which this impression will lead. *Loevsky,* 70 Haw. at 428, 773 P.2d at 1126. The trial court will then have to determine whether "the tape's visual contents constitute a veiled attempt to successfully re-create the [incident in question] under controlled conditions favorable to [the party offering the evidence,]" *id.,* or put another way, whether "the drama of the filmed [event] could easily overcome the logic of the distinctions." *Fusco v. General Motors Corp.,* 11 F.3d 259, 264 (1st Cir.1993).

The determination of whether a "veiled attempt" at a reenactment existed invites a comparison between the contents of the videotape and the actual incident. The comparison, however, focuses on the differences, instead of the similarities, between the incident at issue and the activity depicted on the videotape. The first step is to identify the logical inferences that the visual presentation creates. The trial court must then look at those aspects of the videotape's contents that are different from the incident at issue to determine whether the differences present a flaw in the logical inference created by the videotape presentation. It is this flawed reasoning that jurors may overlook because of the "drama of the filmed event[,]" resulting in the jurors being misled. *Id.* Admittedly, this type of determination is not easy. "Scientific principles, when demonstrated in a fairly abstract way, are quite unlikely to be confused with the events on trial. The more troublesome cases, however, are ones ... where some principles of some kind may be demonstrated but in a fashion that looks very much like a recreation of the event that gave rise to the trial." *Id.* at 264 n. 5.

We now apply the above-mentioned principles to the present case.

### b. *Admissibility of the videotape in the present case*

#### i. *The trial court abused its discretion by ruling on the videotape's admissibility without first previewing the videotape.*

The first question is whether the trial court abused its discretion by ruling on the admissibility of the videotape without first viewing the tape's contents. We hold that the trial court abused its discretion in this regard.

On June 16, 1992, Plaintiffs filed a motion in limine to exclude all evidence relating to tests and experiments conducted by Defendants' experts, including a videotape of the tests and experiments, as being irrelevant, prejudicial and misleading. Plaintiffs' main argument was that the tests and experiments were conducted under conditions that were not "substantially similar" to the accident at Apollo. The following day, a hearing was held on this motion, and the trial court reserved its ruling on the motion until the trial because the evidence was not before the trial court.

During the trial on June 25, 1992, the trial court conducted a hearing without the jury to resolve Plaintiffs' motion in limine. Weisel was placed on the stand and described the tests and experiments, as well as the circumstances surrounding them. At the end of Weisel's testimony, Defendants' counsel requested that the trial court make a ruling based on Weisel's testimony. Plaintiffs' counsel interjected and requested the trial court view the videotape before making its ruling on its admissibility as suggested by the Hawai'i Supreme Court in *Loevsky,* 70 Haw. at 424 n. 6, 773 P.2d. at 1123 n. 6. In response, the trial court indicated that it was "not ready to rule on" the issue and "[w]hether or not I'm going to review the video is something else."

A recess was taken and the hearing continued the following day. Plaintiffs' counsel again reminded the trial court of *Loevsky*'s admonition, then requested the trial court rule on whether it would view the tape before making a ruling on its admissibility. The trial court acknowledged Plaintiffs' arguments, but denied Plaintiffs' motion in limine.

[PLAINTIFFS' COUNSEL]: ... In addition, I do mention to the Court the *Loevsky vs. Cartier* [sic] case, 70 Hawaii 419 [773 P.2d 1120], and I'm reading on the headnote where the admissibility of the video content is an issue in a judicial proceeding which reads, we direct that the [Hawai'i] trial court in the future undertake their best efforts in attempting to view the subject video recording prior to ruling on its admissibility.

. . . .

THE COURT: You made that point yesterday. I just want to hear any addition to what point you made yesterday. . . .

. . . .

[PLAINTIFFS' COUNSEL]: I'd ask the court to make a ruling in the Supreme Court ruling under, whether the Court is going to view the video tape before ruling.

[DEFENDANTS' COUNSEL]: In light of the fact that [Plaintiffs' counsel] has been provided a copy of that original tape, unless he can point to the Court something as to what it is that's objectionable, I don't think he has laid groundwork for a ruling by this court that the tape is an issue.

THE COURT: Is the tape merely a demonstration of the test that [Weisel's] been speaking about?

[DEFENDANTS' COUNSEL]: Exactly, Your Honor.

THE COURT: Okay. I'm ready to rule on this matter.

As to whether ... Weisel will be permitted to testify with regard to his test, I'm going to permit that testimony. That's my ruling. I want to move on to another matter.

■ Implicit in the trial court's ruling allowing Weisel's testimony about the tests and experiments is that Weisel would also be allowed to use the videotape of those tests and experiments during his testimony. It is clear from the above exchange that the trial court did not view the videotape prior to making its ruling. The trial court had ample opportunity to view the tape because a recess was taken soon after defense counsel inquired whether the trial court intended to view the tape. The trial court was also aware of *Loevsky*'s admonition that the tape be previewed before ruling on its admissibility. Therefore, we hold that the trial court abused its discretion in admitting the videotape into evidence without first previewing the tape's contents. However, the trial court's error in admitting the videotape into evidence "is not a basis for reversal absent 'substantial resulting prejudice' to the rights of a party." Commentary to HRE Rule 103[3] (quoting *Trask v. Kam*, 44 Haw. 10, 22, 352 P.2d 320, 326 (1959)). We therefore consider whether substantial rights were prejudiced by the admission of the videotape evidence by examining its admissibility.

ii. *The videotape is not admissible as a recreation because its contents were not substantially similar to the accident at Apollo.*

■ The tests and experiments depicted in the videotape were clearly dissimilar to the fire that occurred at Apollo.[4] The videotape is therefore not admissible as evidence depicting a reconstruction of an incident. Defendants maintain that the videotape was offered to demonstrate the principle that a certain percentage of lacquer thinner is required for mineral spirits to ignite; and it is

---

**3.** Hawai'i Rules of Evidence Rule 103(a) provides in relevant part that: "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"

**4.** In their opening brief, Plaintiffs pointed out some of the dissimilarities between the tests and experiments depicted in the videotape and the incident:

[1.] The videotape test chamber was an insulated compartment. . . .

[2.] A different parts washer was used. . . .

[3.] The test was conducted in a very different temperature and atmospheric environment. . . .

[4.] The fluid did not include the same residue and debris, nor had the heated solution sat in the videotaped machine overnight.

. . . .

[5.] There was a great difference between the volume of solution and vapor present in the tin cans compared to the much larger parts washer tub.

[6.] The match used as an ignition source generates nowhere near as intense a heat as an electrical spark.

this principle which formed the basis of Defendants' experts' opinion that the lacquer thinner had been used in the parts washer at Apollo. In other words, Defendants argue that the videotape is admissible because it illustrates certain scientific principles that its experts used in forming their opinions. The question before us, therefore, is whether the probative value of the videotape is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury. Similar to the *Loevsky* court, we viewed the videotape and performed the necessary balancing test to resolve the issue of the tape's admissibility.

### iii. *The prejudicial impact of the videotape substantially outweighed its probative value.*

 The videotape began with the vapor/switch test, showing a parts washer similar to the one at Apollo, inside a small insulated room. The parts washer was filled with solvent that, according to Weisel, was pure mineral spirits. This portion of the tape generally showed the following actions: (1) Woodcock repeatedly turning the parts washer on and off; (2) Woodcock splashing solvent over various portions of the parts washer, including the switch housing, then turning the unit on and off; and (3) Woodcock placing a piece of cloth soaked in solvent on top of the switch housing and then turning the switch on and off. None of these actions produced any fires.

The scene then changed to the ignitability experiments. This portion showed a number of cans filled with varying mixtures of mineral spirits and lacquer thinner. While the picture was focused on a can, a hand holding a pair of pliers with a lit match approached the can. When the match was over or next to the can, a burst of flame appeared inside the can. The only time a can did not catch on fire was when it was filled with pure mineral spirits. After a can caught fire, a thin piece of flat metal was placed over the lid of the can to extinguish the flame.

The scene changed one more time. This time it showed a switch mechanism by itself, being turned on and off. An electrical arc was visible as small flashes of bright light at the spot where parts of the switch mechanism came into contact with each other. Mineral spirits were then poured inside the switch, and the action of turning the switch on and off was repeated several times. This did not generate any fires.

The purpose of the vapor/switch test was to determine whether the parts washer or the switch mechanism would catch on fire if it was turned on and off while in close proximity to pure mineral spirits. The ignitability experiments were designed to show at what level a mixture of lacquer thinner and mineral spirits will ignite. Although both the vapor/switch test and the ignitability experiments may have been necessary to explain the role that lacquer thinner may have played in the Apollo parts washer accident, this type of evidence could have been presented to the jury using alternative means. For example, the oral testimony of Defendants' experts relating what they did and then offering their opinion may have been sufficient. If it was necessary for the jury to view a videotape of the experts' tests or experiments to help the jurors understand the experts' testimony, such a presentation could have been done differently, i.e., without the flaws discussed below. The most obvious approach is to separate the presentation of the vapor/switch test from the ignitability experiments.

Upon reviewing the videotape presentation, we believe it to be misleading. The logical inference created by the videotape presentation was that the parts washer would not have caught fire if it was filled only with mineral spirits and that the presence of lacquer thinner in the parts washer was the cause of the fire at Apollo. However, this logical inference is flawed. A different parts washer was used. The video test chamber was an insulated compartment, dissimilar to the environment of the warehouse on the day of the accident. The test was conducted in a different temperature and atmospheric environment. There was a great difference between the volume of solution and vapor present in the tin cans compared to the much larger parts washer tub. The match used as an ignition source generates nowhere near as intense heat as an

electrical spark, and the lacquer thinner used may have had a much lower flashpoint. We believe that the visual impression left by the videotape presentation constitutes a veiled attempt by Defendants to recreate the parts washer accident under controlled conditions favorable to their position.

For example, *Ontai v. Straub Clinic and Hospital, Inc.*, 66 Haw. 237, 659 P.2d 734 (1983) held that in order to impose strict tort liability upon the manufacturer because of a design defect, the plaintiff must prove that the product was used in an intended or reasonably foreseeable manner, that the manufacturer breached its duty by producing a dangerously defective product, and that the defect was a proximate cause of the plaintiff's injuries. We believe the combined presentation of the vapor/switch test and the ignitability experiments could have persuaded the jury to conclude that the parts washer was not used in an intended or reasonably foreseeable manner at the time of the accident and, therefore, find no liability on the manufacturer or the other Defendants.

We conclude that the prejudicial and misleading impact of the videotape's contents on the jury far outweighed its probative value and, therefore, hold that the trial court abused its discretion in admitting the videotape into evidence and showing it to the jury. Accordingly, we hold that the trial court abused its discretion in denying Plaintiffs' motion for new trial.

### 3. *Other issues*

Although we need not address the evidence issues, we do so as guidance in the event of a new trial. We address (1) above.

■ Plaintiffs contend that the trial court abused its discretion by permitting Defendants' witness, Thomas William Dose, a branch manager for Allied's office in Taiwan, to testify that 14,000 similar, but not identical, parts washers had been shipped to a Nevada company, and that about 13,000 parts washers had been shipped to Allied without any report of incidents. Plaintiffs objected to Dose's testimony arguing that Defendants have not "established foundation that the prior uses were similar to" the subject accident.

■ In order to admit evidence of lack of prior accidents, Defendants must meet the following requirements: (1) there must be proof "that the absence [of accidents] occurred when the product was used under conditions substantially similar to those faced by plaintiff[,]" and in a number sufficient so as to make the absence of accidents meaningful; however, "specific proof that conditions are similar should not be required when the experience shown is so extensive as to justify the inference that it included an adequate number of situations like the one in [this] suit"; *McJunkins v. Windham Power Lifts, Inc.*, 767 S.W.2d 95, 99–100 (Mo.App.1989); *Walker v. Trico Mfg. Co., Inc.*, 487 F.2d 595, 599–600 (7th Cir.1973), *cert. denied*, 415 U.S. 978, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974); and (2) Defendants must demonstrate that a communication system was in place whereby accidents could or would be reported or recorded. *Jones v. Pak–Mor Mfg. Co.*, 145 Ariz. 121, 700 P.2d 819, 825, *cert. denied*, 474 U.S. 948, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985); *Boy v. ITT Grinnell Corp.*, 150 Ariz. 526, 724 P.2d 612, 618 (App.1986) (witness had not established that he would have learned of prior incidents).

In the instant case, we believe that Defendants have met requirement (1) above. Since Plaintiffs' argument was essentially that the parts washer ignited when used with a solvent contaminated by the parts being washed, and that such contamination was inherent in the use of the washer, it would appear that the sale/use of 14,000 substantially similar washers would be sufficient to infer that an adequate number of like contaminations had occurred without incident.

However, we believe Defendants failed to satisfy requirement (2) above. Our review of the transcript indicates that Defendants failed to establish that there was an accident reporting system whereby accidents would have been reported and, therefore, failed to lay the required foundation. Accordingly, we conclude that Dose's testimony as to the lack of prior accidents should not have been admitted without a proper foundation.

Based upon our review of the records, briefs and arguments, we conclude that Plaintiffs' remaining points of error in connection with their motion for new trial and motion for mistrial are without merit.

## III. CONCLUSION

For the reasons set forth above, we affirm the trial court's denial of Plaintiffs' motions for directed verdict and JNOV, but we reverse the court's January 15, 1993 order denying Plaintiffs' motion for new trial. We remand for a new trial consistent with this opinion.